HOSPITAL CORPORATION OF AMERICA, Terre Haute Regional Hospital, Inc., and Manuel A. Cacdac, M.D., Appellants,

v.

Katherine L. HILAND, George M. Hiland, Richard Pemberton, Jr., and Sallie Pemberton, Appellees.

No. 23A01–8907–CV–240.

Court of Appeals of Indiana, First District.

Dec. 18, 1989.

Rehearing Denied Jan. 24, 1990.

John D. Nell, Katherine L. Shelby, Wooden, McLaughlin & Sterner, Indianapolis, for Hospital Corp. of America and Terre Haute Regional Hosp., Inc.

John Christopher Wall, Patrick, Wilkinson, Goeller & Modesitt, Terre Haute, for Manuel A. Cacdac, M.D.

Mary A. Findling, David J. Dreyer, Price & Shula, Indianapolis, Eric A. Frey, Frey, Hunt, Hassler & Lorenz, Terre Haute, for appellees.

BAKER, Judge.

## STATEMENT OF THE CASE

This is a consolidated appeal.[1] Defendant-appellants, Hospital Corporation of America, Terre Haute Regional Hospital, Inc. (the hospital) and Manuel A. Cacdac, M.D. (Cacdac), appeal the trial court's decision denying their motions for summary

---

**1.** Richard and Sallie Pemberton v. Hospital Corporation of America and Terre Haute Regional Hospital, Cause No. 23A04–8906–CV–268 in this court, and Hiland v. Hospital Corporation of America, Terre Haute Regional Hospital, and Manuel A. Cacdac, M.D., Cause No. 23A01–8907–CV–240, are both appeals from the Foun-

tain Circuit Court. The trial court held a joint hearing on the defendants' motions for summary judgment because the cases involved common questions of law and fact. Thus, they were ordered consolidated for consideration on appeal. *See* Ind.Rules of Procedure, Appellate Rule 5(B).

judgment in favor of plaintiff-appellees, Katherine L. Hiland and her husband, George M. Hiland, and Richard Pemberton, Jr. and his wife, Sallie Pemberton.

We reverse and remand with instructions.

## STATEMENT OF THE FACTS

In May, 1981, Katherine Hiland (Hiland), consulted Cacdac complaining of low back and neck pain. After performing an examination, Cacdac advised Hiland that she should have a complete myelogram. Thereafter, Hiland was admitted to the hospital and was given a cervical and lumbar myelogram. The hospital's radiologist interpreted the lumbar films as revealing a normal appearance of the spinal cord. Cacdac, however, interpreted the films as revealing a deteriorated disc which had to be removed surgically. Based upon Cacdac's recommendations, Hiland consented to lumbar surgery and underwent an operation on June 16, 1981. Hiland has alleged that this surgery was unnecessary and was fraudulently performed for the sole purpose of benefiting Cacdac financially.

Following her surgery and discharge from the hospital, Hiland consulted with Cacdac for five monthly follow-up visits through November, 1981. Throughout these post-operative visits, Cacdac informed Hiland that it would take a year or two for her back to heal. Hiland visited Cacdac again in November of 1982 complaining of back pain. She continued to experience neck and back discomfort and in that regard consulted two other physicians in the first quarter of 1983. Although one of the physicians advised Hiland that she might have arthritis in her spine, neither of them informed her that Cacdac had operated unnecessarily on her back. Having obtained no relief, Hiland returned to Cacdac and related the other physician's diagnosis. Cacdac denied that she had arthritis, and after reviewing the results of a neurological examination, prescribed the use of a soft cervical collar and back brace. Hiland had two other office visits with Cacdac in 1984 and her last consultation was on January 2, 1985. She alleges she maintained a

doctor-patient relationship with Cacdac up to and including April 11, 1985, at which time she purchased a new back brace pursuant to a prescription she had obtained from his office earlier that month.

Hiland's neck pain continued to worsen and she consulted Dr. Marlene Aldo–Benson, a rheumatologist at the Indiana University Medical Center, about her condition. After reviewing x-rays taken prior to her lumbar surgery, Benson advised Hiland that she had osteoarthritis of the spine and that this condition existed before Cacdac operated on her. Benson further informed her that surgery was the last method recommended for treating that condition. Hiland maintains that it was at this point, June 10, 1985, that she determined that the 1981 lumbar surgery performed by Cacdac was unnecessary.

Throughout the remainder of 1985 and during 1986, Hiland spoke with three different attorneys about her case. Finally, on April 9, 1987, the Hilands commenced an action against the hospital and Cacdac.

Richard Pemberton (Pemberton) sought treatment from Cacdac on four separate occasions. In April, 1984, he visited Cacdac for intermittently recurring pain in his lower back and neck and severe numbness and loss of use of his right arm. Cacdac ordered a myelogram the results of which, as reported by a radiologist employed by the hospital, indicated Pemberton had a normal lumbar. Nevertheless, Cacdac advised Pemberton that he had a deteriorated disc in his lower back and one in his neck. Upon Cacdac's recommendation, Pemberton consented to undergo cervical disc surgery which was performed at the hospital in April, 1984. Pemberton's lower back pain continued and he returned to the hospital in July, 1984. At that time, Cacdac prescribed a chemonucleolysis injection to alleviate the pain. Pemberton remained in the hospital 48 hours and was thereafter discharged. Following his discharge, Pemberton continued to see Cacdac. In March, 1985, he was admitted to the hospital by Cacdac at which time Cacdac performed lumbar surgery in order to remove the other disc. Finally, in August, 1986, Cac-

dac performed a second myelogram upon Pemberton.

On March 13, 1987, the Pembertons brought suit against the hospital alleging that the treatments for which Pemberton had been admitted to the hospital by Cacdac were not necessary or warranted or were performed improperly. The complaint further alleged that agents of the hospital were or should have been aware of Cacdac's actions and negligently failed to stop Cacdac or warn Pemberton. Similarly, the Hilands' complaint against the hospital and Cacdac alleged that the surgical procedures performed by Cacdac on June 15, 1981, were unnecessary and improper. The complaint further stated that the hospital failed to take steps to stop Cacdac or warn Hiland of the unnecessary surgery.

Thereafter, the hospital moved for partial summary judgment asserting, inter alia, that Pemberton's claims arising out of the occurrences in April, 1984 and July, 1984 were barred by the applicable statute of limitations. Likewise, in response to Hiland's complaint, both the hospital and Cacdac filed motions for summary judgment asserting that Hiland's suit was barred by the two-year statute of limitations applicable to medical malpractice claims. *See* IND.CODE 16–9.5–3–1. Thereafter, on May 19, 1989, the trial court conducted a combined hearing on the motions for summary judgment filed by Cacdac against the Hilands and the hospital against both the Hilands and the Pembertons. After taking the matter under advisement, the trial court entered an order denying all of the motions for summary judgment. Cacdac and the hospital subsequently instituted this appeal.

## ISSUES

I. Whether the trial court erred in denying Cacdac's motion for summary judgment filed against Hiland.

II. Whether the trial court erred in denying the hospital's motion for summary judgment filed against Hiland and partial motion for summary judgment filed against Pemberton.

## DISCUSSION AND DECISION

The rules governing summary judgment are well settled. In reviewing a motion for summary judgment, we apply the same standard as that employed by the trial court. Summary judgment may be granted only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits and testimony show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Howard v. H.J. Ricks Construction Co., Inc.* (1987), Ind.App., 509 N.E.2d 201, *trans. denied.* We will reverse only if the record discloses an unresolved issue of fact or an incorrect application of the law to undisputed facts. *Morris v. Lyons Capitol Resources, Inc.* (1987), Ind., 510 N.E.2d 221.

## I.

### *Cacdac's Motion for Summary Judgment Against Hiland*

The statute of limitations applicable to medical malpractice claims, IND.CODE 16–9.5–3–1, provides in pertinent part:

(a) No claim, whether in contract or tort, may be brought against a health care provider based upon professional services or health care rendered or that should have been rendered unless filed within two (2) years from the date of the alleged act, omission or neglect....

This statute has repeatedly been described as an "occurrence" rather than a "discovery" statute. *Cyrus v. Nero* (1989), Ind.App., 546 N.E.2d 328; *Jones v. Cloyd* (1989), Ind.App., 534 N.E.2d 257; *Guinn v. Light* (1988), Ind.App., 531 N.E.2d 534; *Ferrell v. Geisler* (1987), Ind.App., 505 N.E.2d 137, *trans. denied; Martin v. Rinck* (1986), Ind.App., 501 N.E.2d 1086; *Spoljaric v. Pangan* (1984), Ind.App., 466 N.E.2d 37, *trans. denied; Colbert v. Waitt* (1982), Ind.App., 445 N.E.2d 1000. Thus, an action for medical malpractice must be filed within two years from the date the alleged negligent act occurred rather than from the date it was discovered.

In response to Cacdac's motion for summary judgment, Hiland argued at

trial and on appeal that the doctrine of fraudulent concealment operated to toll the running of the statute of limitations. The doctrine of fraudulent concealment operates to estop a defendant from asserting a statute of limitations defense when that person, by deception or a violation of a duty, has concealed material facts from the plaintiff thereby preventing discovery of a wrong. *Cyrus, supra; Ferrell, supra; Spoljaric, supra; Nahmias v. Trustees of Indiana University* (1983), Ind.App., 444 N.E.2d 1204, *trans. denied.* Thus, equitable estoppel can arise either from active efforts to conceal the malpractice or from failure to disclose material information when a fiduciary or confidential relationship exists between the physician and patient. *Id.* The physician's failure to disclose that which he knows, or in the exercise of reasonable care should have known, constitutes constructive fraud. This constructive fraud terminates at the conclusion of the physician-patient relationship at which time the statute of limitations begins to run. *Ferrell, supra; Spoljaric, supra.* The statute will also commence to run after a patient learns of the malpractice, or discovers information which would lead to the discovery of the malpractice if the patient exercises reasonable diligence. *Id.* Fraudulent concealment thus tolls the running of the statute of limitations until either the physician-patient relationship is terminated or the patient discovers the malpractice or learns information which in the exercise of due diligence would lead to the discovery of the malpractice. *Ferrell, supra; Spoljaric, supra; Nahmias, supra.*

█ Under the fraudulent concealment doctrine, however, the plaintiff does not have two full years from the discovery of the alleged malpractice in which to file a claim. Rather, the law places upon a plaintiff the responsibility to institute an action within a reasonable time after discovery of the alleged malpractice. *Cyrus, supra; Walters v. Rinker* (1988), Ind.App., 520 N.E.2d 468, *trans. denied; Ferrell, supra; Spoljaric, supra; see also Burks v. Rushmore* (1989), Ind., 534 N.E.2d 1101. Thus,

although equitable grounds exist for estopping a defendant from claiming the statute of limitations as a defense, estoppel will be denied if the plaintiff fails to exercise due diligence in filing his claim after the equitable grounds cease to be operational as a valid basis for inducing the plaintiff's delay. *Ferrell, supra; Spoljaric, supra.*

In the instant case, we are of the opinion that Hiland did not file her claim within a reasonable time after discovering the alleged malpractice. By her own account, Hiland gained the subjective belief on June 10, 1985, that the surgery performed by Cacdac upon her back was unnecessary. In fact, Hiland spoke with three separate attorneys about her case in 1985 and 1986. Hiland, however, did not file her complaint until April 9, 1987, 22 months after the latest date she discovered the alleged malpractice. A 22–month delay is unreasonable under the facts of our case. This holding is consistent with our recent decision in *Cyrus, supra* (22–month delay between time plaintiff discovered her pregnancy, and thus the failure of a sterilization procedure, held unreasonable); and *Walters, supra* (15–month period between the time plaintiff discovered he had cancer, and thus the incorrect diagnosis of his tumor, and the date he filed his complaint held an unreasonable delay). The trial court erred in failing to enter summary judgment in favor of Cacdac on the basis that Hiland's complaint was not timely filed.

## II.

*Hospital's Motions for Summary Judgment Filed Against Hiland and Pemberton*

The hospital also contends that Hiland's claim against it for the surgery performed upon her by Cacdac in June, 1981, as well as Pemberton's claims arising out of his neck surgery in April, 1984, and the chemonucleolysis injection in July, 1984, are barred by the failure to file such within the two-year limitation period set forth in IND. CODE 34–4–19–1.[2] Both Hiland and Pem-

2. The former medical malpractice statute of limitations.

berton argue in response, however, that the statute of limitations was tolled by virtue of the doctrines of fraudulent concealment and continuing wrong. Because the trial court denied the hospital's motions without indicating the grounds upon which it based its decision, we will address each theory below.

### A. Active Fraudulent Concealment.

As discussed above, fraudulent concealment arises as an equitable bar precluding a defendant from asserting the statute of limitations as a defense where there exists active efforts to conceal the malpractice or a failure to disclose information by one under a fiduciary obligation to do so. *Cyrus, supra; Ferrell, supra; Spoljaric, supra.* Initially, both Hiland and Pemberton argue that the doctrine of active fraudulent concealment is applicable here. However, Hiland and Pemberton do not argue on appeal that the hospital undertook any direct affirmative efforts to fraudulently conceal any alleged malpractice on its part.[3] Rather, they argue that under the doctrine of apparent authority, Cacdac's alleged active misrepresentations may be imputed to the hospital. In support of this proposition, Hiland and Pemberton cite *Pamperin v. Trinity Memorial Hospital* (1988), 144 Wis.2d 188, 423 N.W.2d 848.

In *Pamperin,* the plaintiff sued the defendant-hospital for the alleged negligence arising out of the care and treatment he received by a radiologist practicing medicine in the hospital's emergency room. The Wisconsin Supreme Court held that a hospital which holds itself out as providing complete medical care can be held liable under the doctrine of apparent authority for the negligent acts of the physicians retained by it to provide emergency room care regardless of whether the person who committed the negligent act was an independent contractor. The court reasoned

that by holding themselves out as providing complete care, hospitals have created the appearance that the hospital, through its agents and employees, treats emergency room patients. The holding in *Pamperin* was limited to suits brought against hospitals for a physician's negligence in providing emergency room care. Specifically, the court stated:

> The rule we adopted today applies only where the patient looks to the hospital as the provider of health care, and the hospital selects the physicians and its staff. Where a patient seeks care from a physician who then uses the hospital facilities, the hospital would not be liable under the doctrine of apparent authority.

423 N.W.2d at 856.

It is undisputed that both Hiland and Pemberton personally selected and were treated by Cacdac as their personal physician prior to being admitted to the hospital. Further, they were each admitted to the hospital by Cacdac and relied solely upon his diagnosis and recommendations. They intended to receive care from him alone. There is absolutely no evidence that Hiland and Pemberton believed Cacdac was an employee of the hospital or thought the hospital was caring for them through Cacdac as its agent. Thus, the doctrine of apparent authority cannot serve as a basis for imputing to the hospital Cacdac's alleged act of misrepresentations.

Nevertheless, even assuming a basis exists for imputing Cacdac's alleged misrepresentations to the hospital, neither Hiland nor Pemberton timely filed their respective claims. As stated above, active fraudulent concealment tolls the running of the statute of limitations until the plaintiff discovers the alleged malpractice or discovers information which in the exercise of reasonable diligence would lead to discovery

---

**3.** In their arguments to the trial court, Hiland and Pemberton suggested that bills received from the hospital for services rendered for Hiland in June, 1981, and for Pemberton in April, 1984 and July, 1984, constituted active fraudulent concealment. Initially, we observe that although each testified about receiving a bill from the hospital, neither testified as to how the bill misled or hindered them from obtaining information about their claim or in any way prevented inquiry or eluded investigation. That omission notwithstanding, we would find that the sending of a bill does not fall within the definition of active fraudulent concealment. *See Wojcik v. Almase* (1983), Ind.App., 451 N.E.2d 336.

of the malpractice. *Cyrus, supra; Ferrell, supra; Spoljaric, supra.*

Pemberton's claims for relief for the neck surgery performed in April, 1984, and the chemonucleolysis injection in July, 1984, were not filed until March, 1987. In his brief, Pemberton baldly asserts that he discovered Cacdac's alleged malpractice at some time after August, 1986. This is the last date in the record from which we can discern Pemberton sought treatment from Cacdac for his back pain. However, there is no evidence in the record indicating when, in fact, Pemberton discovered either of his claims. Assuming it was indeed at some time after August, 1986, the record is devoid of any evidence as to what Pemberton did prior to that date to discover the claims or why he should not have discovered them earlier.

■ We acknowledge that this court must construe the evidence in favor of the opponent to a motion for summary judgment. The burden of showing when Pemberton discovered his claim and that he exercised reasonable diligence in that regard rested upon Pemberton, however. The naked assertion that Pemberton did not discover his claim until after August, 1986, standing alone, is insufficient to establish a genuine issue of material fact regarding reasonable diligence. *See Lambert v. Stark* (1985), Ind.App., 484 N.E.2d 630. Thus, Pemberton failed to establish as a matter of law that he was entitled to the equitable claim of fraudulent concealment as a defense to the statute of limitations for commencing a medical malpractice action.

■ Hiland, on the other hand, established that she discovered her claim in June, 1985. She did not bring suit against the hospital or Cacdac until April, 1987. In addition to requiring a plaintiff to exercise due diligence to discover the alleged malpractice, the law requires the plaintiff to commence an action within a reasonable time of that discovery. *Cyrus, supra; Walters, supra; Ferrell, supra; Spoljaric, supra.* For the reasons discussed at length above with respect to Hiland's claim

against Cacdac, her suit against the hospital was not filed within a reasonable time.

**B. Constructive Fraudulent Concealment.**

■ In the alternative, both Hiland and Pemberton assert that the doctrine of constructive fraudulent concealment operates to toll the statute of limitations. Constructive fraudulent concealment arises when the physician fails to disclose that which he knows, or in the exercise of reasonable care should know, where a fiduciary or confidential relationship exists between the parties. *Ferrell, supra; Spoljaric, supra.* A confidential relationship exists whenever a confidence is reposed by one party in another with resulting superiority in influence exercised by the other. *Hunter v. Hunter* (1972), 152 Ind.App. 365, 283 N.E.2d 775. Not only must there be confidence by one party in the other, but the party reposing the confidence must also be in the position of inequality, dependence, weakness, or lack of knowledge. *Id.*

Hiland and Pemberton baldly assert that the hospital had superiority over them because they relied upon expert opinions for the treatment of their ailments and the interpretation of tests. Neither Hiland nor Pemberton identify any specific test or opinion communicated to them by the hospital upon which they relied. Rather, they complain that the hospital failed to inform them of the results of the myelograms or of the radiologist's opinions that those tests did not reveal lumbar cervical defects. Contrary to their assertion, however, the undisputed evidence reveals that both Hiland and Pemberton relied exclusively upon Cacdac as their personal physician for diagnosis and treatment of their illnesses. There is absolutely no evidence to indicate that there existed a dominant relationship between Hiland and Pemberton and the hospital or that the hospital was in a position to improperly influence them. Instead, Hiland and Pemberton maintained a confidential relationship with Cacdac. Further, Hiland and Pemberton failed to cite any authority for the proposition that a hospital is in a fiduciary relationship with a patient under the treatment of his personal physician rather than one selected and pro-

vided for the patient by the hospital. Absent a confidential relationship, there existed no duty on the part of the hospital to disclose any information to Hiland or Pemberton, and thus no constructive fraudulent concealment for its failure to do so.

■ In any event, even assuming a duty to disclose existed, neither Hiland nor Pemberton timely filed their claims. Constructive fraud terminates at the conclusion of the relationship at which time the concealment ceases and the statute of limitations commences to run. *Cyrus, supra; Ferrell, supra; Spoljaric, supra.* The plaintiff does not have until discovery of the malpractice as Hiland and Pemberton allege. Such is the case only when there have been affirmative acts of misrepresentation. *Id.*

In the case at bar, it cannot be disputed that if a confidential relationship ever existed, it terminated when Hiland and Pemberton were discharged from the hospital. After they were discharged from the hospital, both Hiland and Pemberton relied solely upon Cacdac for treatment and care. Hiland was discharged from the hospital on June 22, 1981. She did not file her claim until March, 1987. Clearly, she did not timely file her claim. The same is true with respect to Pemberton. Pemberton was discharged from the hospital shortly after both his neck surgery in April, 1984, and the chemonucleolysis injection in July, 1984. However, he did not file his claim until March, 1987, nearly three years after both procedures. Thus, under this theory Pemberton is foreclosed by the statute of limitations from bringing his claims against the hospital.

## C. Continuing Wrong.

■ Finally, Hiland and Pemberton briefly argue that the doctrine of continuing wrong operates to estop the hospital from asserting the statute of limitations as a defense. The doctrine of continuing wrong is applicable where an entire course of conduct combines to produce an injury. *Ferrell, supra; Frady v. Hedgcock* (1986), Ind.App., 497 N.E.2d 620, *trans. denied.* When certain conduct is determined to con-

stitute a continuing wrong, the statute of limitations is tolled so that it does not commence running until the wrongful act ceases. *Id.*

With little or no citation to the record, Hiland and Pemberton assert that there was overwhelming evidence establishing that the hospital engaged in a continuing wrong. We disagree. The cases applying the continuing wrong doctrine demonstrate that the alleged injury-producing conduct must be of a continuing nature. For example, *Ferrell* involved the continuing failure of the defendant-doctor to diagnose the plaintiff's breast cancer. Likewise, *Frady* involved the long-term prescription of medications and the defendant-doctor's failure to diagnosis the plaintiff's renal failure. In each case, the continuing failure of the treating physician to diagnose produced the injury.

In the case at bar, there is no evidence of a series of medical treatments by the hospital which caused Hiland's injuries. In fact, the only wrong which allegedly caused the damages complained of is the surgery performed by Cacdac in June, 1981. No further treatment or action by the hospital could or is alleged to have caused Hiland to suffer damages. There is no evidence Hiland received any treatment at the hospital after June, 1981, for the condition that gave rise to the surgery, nor is it disputed that Hiland did not rely on the hospital for the medical care of her back after her discharge from the hospital. Thus, the doctrine of continuing wrong was inapplicable to Hiland and does not operate as a defense to the statute of limitations.

The same holds true with respect to Pemberton. Regarding his claim arising from his neck surgery in April, 1984, it is undisputed that Cacdac performed that surgery. Further, there is absolutely no evidence that Pemberton was ever treated by the hospital for the neck and arm pain which led to the neck surgery. Nor is there evidence that Pemberton relied upon the hospital to treat his neck pain after his discharge from the hospital. Likewise, Cacdac performed the chemonucleolysis injection to Pemberton's spine in July, 1984, to

treat his lower back pain. While Pemberton was treated at the hospital for his lower back pain subsequent to his discharge, the evidence establishes that such treatment was exclusively provided by or at Cacdac's direction. Moreover, Pemberton relied solely upon Cacdac to provide medical care for his lower back condition after his discharge. Thus, the continuing wrong theory does not avoid the statute of limitations with respect to Pemberton's claims arising from the April, 1984 surgery or the July, 1984 injection. The trial court erred in failing to enter summary judgment in favor of the hospital regarding Hiland and Pemberton's respective claims.

The judgment of the trial court is reversed and the cause remanded with instructions to enter summary judgments consistent with this opinion.

RATLIFF, C.J., concurs.

ROBERTSON J., concurs with separate opinion.

ROBERTSON, Judge, concurring.

I concur in the opinion as it pertains to the hospital and concur in result as it pertains to the physician.